UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____x

T.C., on behalf of her minor son R.C.          Case No. 1:15-cv-04844 (AMD)(LB)
and in her individual capacity,

                Plaintiff,          **FIRST AMENDED COMPLAINT**

    -against-

The City of New York, The New York City
Department of Education, School Safety Agent        JURY TRIAL DEMANDED
Barrios, in his individual and official capacities,
School Safety Agent Ruperto, in his individual
and official capacities, Assistant Principal of
Security Joseph Burbano, in his individual and
official capacities, Principal Auriela Curtis, in her
individual and official capacities, Dean Troy McGie,
in his individual and official capacities, Special
Education Teacher Chad Connor, individual and official
capacities, District Representative Charles Pumilia,
in his individual and official capacities, Guidance
Counselor Janis Guash, in her individual and official
capacities, School Safety Agents John and Jane Does 1-10,
in their individual and official capacities and New York
City Police Officers John and Jane Does 1-10 in their
individual and official capacities,

               Defendants.

_____x

      Plaintiff, by and through her undersigned attorneys, as and for her Complaint against

Defendants, alleges as follows:

## PRELIMINARY STATEMENT

      1.     This lawsuit challenges the unconstitutional seizure and use of excessive force

against a New York City public high school student by members/agents of the School Safety

Division, a branch of the New York City Police Department (the "School Safety Division" of the

"NYPD") in collaboration with the New York City Department of Education (the "DOE") and

the administration of Curtis High School ("Curtis H.S.") in Staten Island, New York in response

to alleged behavior, that even if true, amounted at most to minor misbehavior by a then sixteen year old African American boy with several diagnosed disabilities.

2.      Significantly, as a result of Defendants' illegal conduct, the minor ("R.C.") suffered serious physical, psychological and emotional injuries, including a concussion and contusions to his neck and body, the symptoms of which he continues to suffer to this day.

3.      On February 13, 2015, Plaintiff's son, R.C., was subjected to the unconstitutional seizure and use of excessive force and denial of medical treatment by School Safety Agents and Assistant Principal of School Safety Jose Burbano at the direction and approval of Dean of Instructional Support Services, Troy McGhie ("Dean McGhie") and Principal Auriela Curtis ("Principal Curtis") in retaliation for his allegedly disrespectful behavior towards a teacher after that teacher erroneously told him to leave the school auditorium because "he did not belong there," and for then hesitating to comply with an order to enter the Dean's office without first calling his mother because he was afraid of the numerous School Safety Officers who had been called to "over-respond" to his alleged transgression.

4.      Defendants' egregious treatment of Plaintiff's minor son was grossly disproportionate to R.C.'s alleged (non-criminal) misbehavior which should not have been handled by School Safety Agents at all.  In fact, R.C.'s behavior was later determined to be a manifestation of his disability and the result of DOE's failure to conduct a functional behavioral assessment (an "FBA") and to implement a behavioral intervention plan (a "BIP") as part of R.C.'s individualized education plan ("IEP").

5.      The unconstitutional seizure and use of excessive force against Plaintiff's son has long been recognized as part of an established policy and practice of unlawfully seizing, handcuffing and arresting schoolchildren, in violation of the Fourth Amendment of the United States Constitution and state law, which manifested itself here when: (a) NYPD School Safety

Division personnel arrested, handcuffed and detained R.C. for a minor violation of school rules without probable cause of criminal activity, and (b) NYPD School Safety Division personnel charged and prosecuted R.C with criminal violations for what was at most a minor violation of school rules, which was confirmed by the outright dismissal of those charges.

6. Moreover, this policy and practice of unlawfully seizing, handcuffing, arresting and using excess force – in addition to the inappropriate use of other disciplinary procedures such as school suspensions for minor school violations has also long been recognized as being used disproportionately against schoolchildren with disabilities like R.C. and whose behavior are in fact manifestations of those disabilities.

7. The DOE and DOE personnel are complicit in this unlawful policy and practice, through their explicit and tacit authorization and approval of School Safety Agents response to "unruly" students as if they were suspected of or engaged in criminal activity. In fact, through their encouragement and acquiescence, the DOE and DOE personnel have ratified and sanctioned the NYPD School Safety Division's use of excessive force and corporal punishment that they themselves are prohibited from using by the DOE's own Discipline Code (the "Discipline Code").

8. The unconstitutional conduct complained of hereunder is also the same conduct complained of by the representative student plaintiffs in the recently settled class action suit in this Court, entitled *Bruno et al., v. The City of New York* et al., Case No. 10-cv-210 (RRM)(SMG), which is incorporated by reference herein, and which resulted in the establishment of a School Safety Working Group, which subsequently made numerous practice and policy recommendations including, *inter alia*, that School Safety Division authority be limited to responding to situations that are criminal in nature, and that DOE administrators have primary responsibility for intervening in and addressing student misbehavior and ensuring consistent application of school rules and policies as set forth in the Discipline Code.

9.      In addition, because the DOE and DOE personnel failed to conduct a functional behavioral assessment (an "FBA") as part of R.C.'s individualized education plan ("IEP") for his diagnosed disabilities, the DOE failed to consider appropriate strategies, including positive behavioral interventions, strategies, and supports in addressing and responding to his misbehavior, and instead, (a) first unnecessarily escalated a "teachable moment" into a physical confrontation with a disabled child; and (b) then directed encouraged School Safety Agents to respond in a grossly disproportionate way to a non-criminal and, at most, minor disciplinary infraction of being disrespectful and then hesitating to enter a room full of School Safety Agents without calling his mother first *because he was afraid of what they might do to him.*

10.     Thus, in addition to being illegal under the Fourth and Fourteenth Amendments themselves, Defendants' actions were also unlawful by reason of R.C.'s disabilities and Defendants' obligation and failure to accommodate those disabilities and to consider and utilize appropriate strategies, including positive behavioral interventions, strategies, and supports in response to what was at most minor misbehavior that was, as discussed below, recognized by an independent hearing examiner to be a manifestation of those disabilities.

## THE PARTIES

11.     Plaintiff T.C. is the mother of her minor son, R.C., who is a seventeen (17) year-old male student at Curtis High School in Staten Island.  At all relevant times, R.C. was and continues to be enrolled in public schools operated by the New York City Department of Education. As R.C.'s mother, Plaintiff T.C. is bringing this action on his behalf and in her individual capacity.

12.     Defendant City of New York (referred to at times as the "City") is a municipal corporation, duly incorporated and existing pursuant to the laws of the State of New York.  The

City has established and maintains the New York City Police Department ("NYPD") as a constituent department or agency of the City.

13.     Defendant New York Department of Education ("DOE") is a department of Defendant City, duly organized and existing under the laws of the State of New York.

14.     Defendant School Safety Agent Barrios was, at all relevant times hereunder, an employee of NYPD School Safety Division acting under color of law.  He is sued in both his individual and official capacities.

15.     Defendant School Safety Agent Ruperto was, at all relevant times hereunder, an employee of NYPD School Safety Division acting under color of law.  He is sued in both his individual and official capacities.

16.     Defendant School Safety Agents John and Jane Does 1-10 were at all relevant times hereunder employees of NYPD School Safety Division acting under color of law. They are sued in their individual and official capacities.

17.     Defendant New York City Police Officers John and Jane Does 1-10 were at all relevant times hereunder employees of NYPD acting under color of law. They are sued in their individual and official capacities.

18.     The City, School Safety Agent Barrios, School Safety Agent Ruperto, School Safety Agents John and Jane Does #1-10, New York City Police Officers John and Jane Does #1-10, are collectively referred to hereinafter as the "City Defendants."

19.     Defendant A.P. Joseph Burbano ("A.P. Burbano") was, at all relevant times hereunder, the Assistant Principal of Security at Curtis High School and an employee of the DOE acting under color of law.  He is sued in his individual and official capacities.

20.     Defendant Troy McGie ("Dean McGie") was, at all relevant times hereunder, the Dean of Instructional Support Services, i.e., "Special Education," at Curtis High School and an employee of the DOE acting under color of law. He is sued in his individual and official capacities.

21.     Defendant Auriela Curtis ("Principal Curtis") was, at all relevant times hereunder, Principal of Curtis High School and an employee of the DOE acting under color of law.  She is sued in her individual and official capacities.

22.     Defendant Special Education Teacher Chad Connor was at all relevant times hereunder a member of Plaintiff's 2014 IEP team and an employee of the DOE acting under color of law.  He is sued in his individual and official capacities.

23.     Defendant District Representative Charles Pumilia was at all relevant times hereunder a member of Plaintiff's 2014 IEP team and an employee of the DOE acting under color of law.  He is sued in his individual and official capacities.

24.     Defendant Guidance Counselor Janis Guash was at all relevant times hereunder a member of Plaintiff's 2014 IEP team and an employee of the DOE acting under color of law.  She is sued in her individual and official capacities.

25.     Defendants DOE, A.P. Burbano, Principal Curtis, Dean McGie, Chad Connor, Charles Pumilia and Janis Guash are hereinafter collectively referred to as the "DOE Defendants."

## JURISDICTION AND VENUE

26.     This action is authorized by 42 U.S.C. §1983, 29 U.S.C. §794(a), 42 U.S.C. §12101 and the United States Constitution.   Subject matter jurisdiction for these federal claims arises under 28 U.S.C. §§ 1331 and 1343(a)(4).

27.     This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.     Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper.

29.     The Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

30.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as this is where a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

31.     Plaintiff's son, R.C., is a seventeen year-old senior at Curtis H.S. in Staten Island, where he has been enrolled as a student since 2012.

32.     T.C. is R.C.'s mother.

33.     B.C. was and is at all relevant times R.C.'s adult sister.

34.     At all relevant times hereunder R.C. had a diagnosed learning disability and an individualized education plan ("IEP").

35.     At all relevant times hereunder R.C. had a diagnosed anxiety disorder for which he was prescribed anti-anxiety medication, which R.C. carried with him at all times to be taken in case of a severe anxiety attack.

36.     At all relevant times hereunder R.C. had a diagnosed severe allergy condition for which he was prescribed an Epipen (epinephrine injection) auto injector which R.C. carried with him at all times in case he had a severe, life threatening allergic reaction.

37.     At all relevant times, DOE Defendants had full and complete knowledge of R.C.'s learning disability and his IEP.

38.     At all relevant times, DOE Defendants had full and complete knowledge of R.C.'s diagnosed anxiety disorder, his prescribed anti-anxiety medication and the fact that he carried his anti-anxiety medication with him at all times to be taken in case of a severe anxiety attack.

39.     At all relevant times, DOE Defendants had full and complete knowledge of R.C.'s diagnosed severe allergy condition, his prescribed Epipen and the fact that he carried his prescribed Epipen to be taken/administered in case he had a severe, life threatening allergic reaction.

40.     On February 13, 2015, at approximately 10:00 A.M., R.C. was attempting to enter a music performance in the Curtis H.S. auditorium he was scheduled to attend with his English class.

41.     As he entered the auditorium R.C. was questioned by a teacher as to who his teacher was ostensibly to determine whether R.C. was authorized to be in auditorium for the music class.

42.     As he was being questioned, R.C. saw his teacher Mr. Farrell approaching the auditorium, who waved/gestured towards him and R.C. told the teacher that Mr. Farrell was his teacher.

43.     Mr. Farrell gestured for R.C. to go into the auditorium but the teacher told Mr. Farrell that R.C. had been too disrespectful and that he would not let him in and in response, Mr. Farrell waved/gestured for R.C. to comply with the teacher's instructions and leave the auditorium.

44.     R.C. complied with Mr. Farrell's directions and left the auditorium and began walking towards the Dean's office where he met Principal Curtis who asked him where he was supposed to be.

45.     R.C. told Principal Curtis advised Principal Curtis that he was supposed to be in the school auditorium but that the teacher would not let him in.

46.     Principal Curtis escorted R.C. back to the auditorium, where R.C. told the teacher, "You see we do belong here."

47.    The teacher apparently considered R.C.'s comment to be disrespectful and in the presence of Principal Curtis, instructed R.C. to again leave the auditorium and go to the Dean's office.

48.    Almost immediately, the teacher reconsidered saying, "Hold on, let me talk to him" but Principal Curtis insisted that R.C. be escorted to the Dean's office by A.P. Burbano.

49.    A.P. Burbano instructed School Safety Agent Barrios and School Safety Agent Ruperto and several other School Safety Agents to escort R.C. to the Dean's office.

50.    As School Safety Agents Barrios and Ruperto and the several other School Safety Agents along with an obviously agitated A.P. Burbano approached the entrance to the Dean's office, R.C. became fearful and anxious over what appeared a clear over-response to anything that R.C. had done and that something bad was going to happen to him if he went inside the Dean's office, and he began suffering from an anxiety/panic attack.

51.    At or near the entrance to the Dean's office, A.P. Burbano approached R.C. and angrily told him to go into the Dean's office immediately.

52.    At all relevant times, DOE Defendants, including A.P. Burbano, Principal Curtis and Dean McGhie knew about R.C.'s learning disabilities, and his anxiety disorder and prescribed anti-anxiety medication.

53.     R.C. told A.P. Burbano that he was beginning to have anxiety/panic attack and that he needed to call his mother before he going into the Dean's office.

54.    Despite A.P. Burbano's prior knowledge of R.C.'s diagnosed anxiety disorder and the fact that R.C. was suffering from increasingly apparent symptoms of an anxiety/panic attack, A.P. Burbano nonetheless refused to allow R.C. to call his mother and angrily demanded that R.C. immediately go into the Dean's office.

55.     R.C. was taken into a stairwell near the Dean's office by a School Safety Agent who tried to convince him to go into the Dean's office.

56.     While R.C. was sitting on the stairs in the stairwell speaking with the School safety Agent, A.P. Burbano entered the stairwell and began grabbing and pulling R.C. by the arm to get him up.

57.     R.C. told A.P. Burbano to stop grabbing and pulling him and got up from the staircase and walked out of the stairwell to the front of the Dean's office where he hesitated and reiterated his request to call his mother before going into the Dean's office.

58.     A.P. Burbano again rejected R.C.'s request despite the fact that R.C. was suffering obvious symptoms of an anxiety/panic attack, and instead ordered School Safety Agents Ruperto and Barrios to physically move R.C. into the Dean's office to be handcuffed and detained.

59.     As they were physically moving R.C. into the Dean's office, School Safety Agents Ruperto and Barrios (with A.P. Burbano close behind), suddenly, and with no advance warning, used excess force to push R.C. from behind and down through the entrance to Dean's office, causing him to land head and face first on the floor immediately inside of the Dean's office.

60.     R.C. experienced extreme pain and a loss of consciousness as a result of being forcibly pushed head and face first on the floor of the Dean's office.

61.     While R.C. was on the floor of the Dean's office, School Safety Agents Ruperto and Barrios continued to use excessive force to restrain and handcuff him, despite the fact that R.C. did not resist their efforts to handcuff him.

62.     While School Safety Agents Ruperto and Barrios were using excess force to push R.C. to the ground, while they were handcuffing him, and after he had been handcuffed, A.P. Burbano also assaulted R.C. by pressing and pinning his knee into R.C.'s neck and head.

63. As a result of School Safety Agents Ruperto and Barrios' use of excessive force/assault and battery and A.P. Burbano's use of excessive force/assault and battery upon R.C., R.C. was put in fear of serious personal injury and did in fact sustain sustained serious physical, psychological and emotional injuries, including a concussion and contusion to his neck.

64. School Safety Agents Ruperto and Barrios also applied and tightened the handcuffs on R.C. in a punitive manner clearly intended to cause R.C. pain, unrelated to any legitimate security purpose.

65. School Safety Agents Ruperto and Barrios also removed and seized R.C.'s belt, jacket and book-bag, stripped him of his gold chain and removed his shoelaces under the premise that he was going to be arrested and that those articles were prohibited at the precinct.

66. Thereafter, R.C. remained handcuffed and was unlawfully detained in the Dean's office for approximately two (2) hours.

67. During the time he was handcuffed and detained in the Dean's office, R.C. repeatedly complained that the handcuffs were causing him pain because they were too tight.

68. Despite R.C.'s complaints and the fact that at all times he was fully compliant, School Safety Agents Ruperto and Barrios and A.P. Burbano refused to loosen or remove the handcuffs.

69. During the time he was handcuffed and detained in the Dean's office, R.C. repeatedly complained that he was suffering from an anxiety attack and requested that he be allowed to take his anti-anxiety medication in his book-bag.

70. Despite their knowledge of his diagnosed anxiety disorder and the fact that he was suffering an apparent and entirely foreseeable anxiety attack, School Safety Agents Ruperto and Barrios and A.P. Burbano rejected R.C.'s requests to take his anti-anxiety medication during the time he was illegally detained in the Dean's office.

71.     Despite the use of excessive force against R.C. and the foreseeable risk that R.C. had suffered head, neck and other injuries as a direct result thereof, school Safety Agents Ruperto and Barrios, A.P. Burbano, did not seek to have R.C. medically examined or treated during the time he was illegally detained in the Dean's office.

72.     Despite the fact that he was suffering an apparent and entirely foreseeable anxiety attack, Safety Agents Ruperto and Barrios and A.P. Burbano did not seek to have R.C. medically examined or treated during the time he was illegally detained in the Dean's office.

73.     Defendants Dean McGie and Principal Curtis witnessed, directed, authorized, approved, sanctioned, ratified, participated in and aided and abetted School Safety Agents Ruperto and Barrios and A.P. Burbano in their use of excessive force against, their illegal/false arrest of, and their withholding of medical attention for R.C. by not seeking to intervene, object or take any action to protect R.C., in violation of their duties *in loco parentis*.

74.     Defendants School Safety Agents John and Jane Does # 1-10 also witnessed, directed, authorized, approved, sanctioned, ratified, participated in and aided and abetted School Safety Agents Ruperto and Barrios' and A.P. Burbano in their use of excessive force against, their illegal/false arrest of, and their withholding of medical attention for R.C. by not seeking to intervene, object or take any action to protect R.C., in violation of their duties as school safety agents to protect the health and safety of students of Curtis H.S., including R.C.

75.     Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, Dean McGie, Principal Curtis and School Safety Agents John and Jane Does # 1-10 had every reason to know that R.C. needed medical attention as a result of R.C.'s continued anxiety/panic attack because they had actual and constructive notice of R.C.'s medical diagnosis of Anxiety Disorder and because his head and neck injuries were reasonably foreseeable results of the use of excessive force against him.

76.     During R.C.'s illegal detention at the Dean's office, Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, Dean McGie, Principal Curtis and School Safety Agents John and Jane Does # 1-10 refused R.C.'s repeated requests to call and speak to his mother by telephone.

77.     During R.C.'s illegal detention at the Dean's office Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, Dean McGie, Principal Curtis and School Safety Agents John and Jane Does # 1-10 illegally denied R.C.'s repeated requests to see and speak to his mother in person.

78.     During his illegal detention at the Dean's office, Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, Dean McGie, Principal Curtis and School Safety Agents John and Jane Does # 1-10 illegally denied Plaintiff T.C.'s repeated demands to see and speak to R.C. to determine his physical health and safety.

79.     During his illegal detention at the Dean's office, Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, Dean McGie, Principal Curtis and School Safety Agents John and Jane Does # 1-10 illegally denied Plaintiff T.C.'s repeated demands to see and speak to R.C. to determine whether his constitutional rights were being violated.

80.     During his illegal detention Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, Dean McGie, Principal Curtis and School Safety Agents John and Jane Does # 1-10 illegally denied B.C.'s demand to see and speak to her brother R.C. to determine his physical health and safety and whether his constitutional rights were being violated.

81.     In order to justify their assault and illegal detention of R.C., Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, falsely arrested and falsely charged R.C. with resisting arrest, obstruction of governmental administration, harassment and disorderly conduct.

82.     According to the Details Section of the NYPD Omniform system arrest report, the reason for R.C.'s arrest was that he had refused to comply with a lawful order given by School Safety Agents Ruperto and Barrios and A.P. Burbano while he was being escorted to Room 124, that he tried to "push by" School Safety Agents Ruperto and Barrios "flaring his arms" and had to be detained.

83.     Defendants Safety Agents Ruperto and Barrios, A.P. Burbano, School Safety Agents John and Jane Does # 1-10 and Defendants NYPD Officers John and/or Jane Doe #1-10 also used excess and inappropriate force by forcibly carrying and transporting R.C. to the 120 Precinct in Staten Island without a coat in below freezing temperatures.

84.      Thereafter, R.C. was unconstitutionally detained at the 120 Precinct for approximately 48 hours pending his arraignment on the false charges.

85.     From the time R.C. initially became fearful and anxious that something bad was going to happen to him, including serious personal injuries or death, if he went inside the Dean's office through his formal arrest and continued detention at the 120 Precinct, R.C. continued to suffer from an anxiety/panic attack, and Defendants NYPD Officers John and/or Jane Doe #1-10 continued to deny his request to take his anti-anxiety medication.

86.     During R.C.'s detention at the 120 Precinct, R.C., Defendants NYPD Officers John and/or Jane Doe #1-10 continued to deny his mother's (T.C.'s) request to see and speak to him to determine his physical health and safety, and whether his constitutional rights had and were continuing to be violated.

87.     During R.C.'s detention at the 120 Precinct, R.C., Defendants NYPD Officers John and/or Jane Doe #1-10 rejected T.C.'s attempts to provide him with his anti-anxiety medication and his Epipen.

88.     During R.C.'s detention at the 120 Precinct, R.C., Defendants NYPD Officers John and/or Jane Doe #1-10 informed Plaintiff T.C. that R.C. would simply be brought to the hospital if he had a severe anxiety attack and or severe allergic reaction.

89.     At some point during his detention at the 120 Precinct, Defendants NYPD Officers John and/or Jane Doe #1-10 had R.C. transported by ambulance to Richmond University Medical Center for treatment of his anxiety/panic attack.

90.     After his medical examination at Richmond University Medical Center, R.C. was returned to custody at the 120 Precinct.

91.     R.C. was arraigned and released to his mothers care on February 15, 2015, after two days of unlawful detention at the 120 Precinct.

92.     Upon his release, T.C. took R.C. to the emergency room at Richmond University Medical Center for an examination and treatment of symptoms of headache, dizziness, loss of consciousness and neck and back pain.

93.     After a series of medical examinations and tests, R.C. was diagnosed with a concussion and neck contusion, and was directed to follow-up with treatment with his primary care doctor.

94.     R.C. was suspended from school effective February 23, 2015.

95.     On March 6, 2015 a suspension hearing (the "Suspension Hearing") was held, where a videotape of the incident proved to be consistent with R.C.'s allegations that School Safety Agents Ruperto and Barrios (with A.P. Burbano close behind) had pushed R.C. from behind down through the entrance to Dean's office, which caused R.C. to land head and face first on the floor immediately inside of the Dean's office.

96.     At the Suspension Hearing, School Safety Agents Ruperto and Barrios and AP Burbano falsely accused R.C. of elbowing School Safety Agent Ruperto and striking School

Safety Agent Barrios.  In fact, the false testimony of School Safety Agents Ruperto and Barrios and AP Burbano directly contradicted the earlier NYPD Omniform system arrest report which showed that R.C. was never charged with an assault upon a School Safety Officer, and that, at worst, R.C. merely tried to "push by" School Safety Agents Ruperto and Barrios "flaring his arms" and had to be detained.

97.    The false testimony of this alleged assault was confirmed by the fact that all of the false charges against R.C. were ultimately dismissed without a trial.  In fact, the testimony taken at the Suspension Hearing supports a finding that the only possible contact between R.C. and School Safety Agents Ruperto and Barrios was while they, along with others, were using excess force to bring him to the ground and unlawfully restrain and handcuff him, and that any contact allegedly initiated by R.C. was either inadvertent and *de minimus* or non-existent.

98.    At the Suspension Hearing, Plaintiff T.C., on behalf of R.C., asserted that School Safety Agents Ruperto and Barrios and A.P. Burbano had used excessive force on R.C., whereupon "school officials" were directed to request an investigation of T.C.'s allegations against School Safety Agents Ruperto and Barrios.

99.    R.C. received notification that both the DOE and the NYPD had been notified of her complaints and that the DOE and the NYPD would conduct and investigation.

100.    Upon information and belief, no investigation into Plaintiff T.C.'s allegations against School Safety Agents Ruperto and Barrios and A.P. Burbano ever took place.

101.    On March 9, 2015, a manifestation determination review ("MDR") regarding R.C.'s alleged behavior on February 13, 2015 concluded that R.C.'s alleged behavior was not a manifestation of his disability.

102.    On April 16, 2015, an impartial hearing was conducted to appeal the MDR.

103.    On April 30, 2015 the MDR was overturned on the grounds that: (i) R.C.'s social and emotional disabilities had resulted in the conduct in question and were connected to his learning disability; (ii) that that Defendant DOE was aware of that R.C. had emotional difficulties that led to the type of behavior at issue at least as far back as January of 2011; (iii) that Defendant DOE should have conducted a Functional Behavior Assessment to address R.C.'s social and emotional needs; and (iv) that Defendant DOE did not inform T.C. that an FBA and a behavioral intervention plan ("BIP") were needed or that recommendations should have been developed on R.C.'s IEP that could address his behavior.

104.    On May 15, 2015, T.C. filed a due process complaint alleging that DOE Defendants, through their assault, false arrest and illegal detention of R.C., their wrongful suspension of R.C. and their failure to accommodate his disabilities, had denied him a Free and Appropriate Public Education (FAPE), thereby exhausting her administrative remedies under the IDEA.

105.    Plaintiff T.C., on behalf of R.C., served a timely notice of claim pursuant to Section 50-e of the New York General Municipal Law.

106.    On August 11, 2015 T.C. filed a Pro Se Complaint on behalf of R.C.


**FACTS ESTABLISHING OFFICIAL MUNICIPAL POLICY**

107.    R.C.'s experience is not isolated but, rather, part of a larger pattern and practice that exists within the New York City public schools.

108.    Since 1998, the NYPD School Safety Division has had authority to patrol and police the buildings and grounds of public schools operated by the Defendant DOE.  Members of the NYPD School Safety Division subject New York City public middle school and high school

students to unjustified seizures and arrests and uses of excessive force with unacceptable frequency. Members of the NYPD School Safety Division handcuff students and/or place them in seclusion rooms, against their will and without parental consent for violations of the law, but rather for minor classroom misbehavior.

109.    Upon information and belief, a significant number of students are ultimately handcuffed and transported to local precincts by members of the NYPD School Safety Division, not for criminal violations, but for—at most—breaking school rules.

110.    Upon information and belief, the City, DOE and DOE personnel have encouraged and ratified this pattern and practice in the majority of cases.

111.    The challenged conduct by members of the NYPD School Safety Division and the DOE Defendants constitutes official municipal policy.  First, the policy and practice of unlawfully seizing and arresting and using excess force against students for minor school misbehavior that does not amount to probable cause of criminal activity is the official stated policy of the NYPD and DOE, which broadly authorizes law enforcement personnel to remove "unruly" children from schools, and in particular, is known to disproportionately impact minorities and students with disabilities. Second, both challenged policies and practices—the unlawful seizures and arrests of, as well as the use of excessive force against schoolchildren—are so widespread and frequent as to constitute a custom and usage of members of the NYPD School Safety Division. Third, the City and DOE Defendants were well aware of, yet deliberately indifferent to, the prevalence of the challenged policies here, failing to make meaningful attempts to improve the training and supervision of members of the NYPD School Safety Division and DOE personnel. For each of these reasons, the policies and practices here are directly attributable to the City and DOE.

**Official Stated Policy**

112.    The policy and practice of unlawfully seizing and arresting schoolchildren for minor misbehavior that does not establish probable cause of criminal activity constitutes the official policy of the City of New York, as originally set forth by former Mayor Bloomberg, former Police Commissioner Raymond W. Kelly and former Assistant Chief James Secreto and continued by their successors in the City and DOE Defendants.

113.    Upon information and belief, former Mayor Bloomberg, Police Commissioner Kelly and Assistant Chief Secret promulgated an official stated policy that the duties of School Safety Officers include enforcing the rules and regulations of the Disciplinary Code and for removing "unruly" students from public school sites, which was approved, adopted and ratified by the DOE.

114.    Upon information and belief, this official stated policy was adopted and continued by the City and DOE Defendants at all relevant times hereunder.

115.    In the instant context, the removal of an "unruly" student by members of the NYPD School Safety Division constitutes a seizure and/or an arrest; students are not free to leave once seized and/or arrested and, often, they are transported to a local police precinct and booked even when they have done nothing more than arguably violate school rules in a non-criminal matter. In addition, although none of the Defendants have ever defined the term "unruly," as a matter of logic and plain language, the term encompasses minor misbehavior that does not amount to probable cause of criminal activity.

### Custom and Usage

116.    The experience of R.C. is by no means unique or anomalous, but is instead representative of widespread and frequent actions by members of the School Safety Division and the DOE, which occur as part of a larger pattern and practice of unlawfully seizing and arresting

students absent probable cause and of using excessive force against schoolchildren, a pattern and practice so prevalent as to amount to a custom and usage of the City and DOE Defendants.

117.    According to NYPD statistics, at least 579 arrests were made and 788 summons issued at schools during the roughly 200 school days that composed the 2012-2013 school year. Disorderly conduct, obstruction of governmental administration, or resisting arrest was the top charge in 15 percent of those arrests, and disorderly conduct charges accounted for nearly 60 percent of all of the summonses.

118.    The existence of this custom and usage is underscored by reference to the high number of complaints filed against School Safety Agents. Upon information and belief, in June of 2007, it was reported that the City had received 2,670 complaints against School Safety Officers since 2002, for an average of 500 per year, indicating that one complaint had been filed for every eight to ten School Safety Officers per year. Moreover, it was reported that 27 percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against regular NYPD officers.

119.    Upon information and belief, during the 2008 calendar year, there were 1,159 complaints filed against School Safety Officers. This figure suggests a staggering rate of almost one complaint for every four School Safety Officers employed, with 15 percent of these complaints alleging excessive force, abuse of authority, discourtesy, or offensive language by School Safety Agents.

120.    Upon information and belief, during the first 11 months of 2010, there were 1,187 complaints of misconduct by School Safety Agents, representing one complaint filed for approximately every four School Safety Agents that year.

121.    Moreover, upon information and belief, these figures vastly underestimate the number of actual complaints, because, as set forth in a report published by the New York Civil

Liberties Union and the American Civil Liberties Union, entitled "Criminalizing the Classroom,"
many parents have been given improper information as to how to file a complaint regarding the
conduct of a School Safety Agent.

### Deliberate Indifference in Failure to Train and Supervise

122.   In addition, the Municipal Defendants have been long aware of the challenged
policies and practices, yet have been indifferent to those patterns and practices, and have not
attempted to remedy them through adequate training and/or supervision of School Safety Agents
and DOE personnel in child and adolescent development, conflicts and de-escalation techniques,
conflict resolution, children with disabilities, the effects of trauma, implicit bias and cultural
competence, the school discipline code, and best practices for policing schools.

123.   In fact, in addition to R.C., countless other New York City public school students
have been victims of the challenged policies and practices in recent years, including but not
limited to the representative student plaintiffs in the recently settled class action suit in this Court,
entitled *Bruno et al., v. The City of New York* et al., Case No. 10-cv-210 (RRM)(SMG).

124.   Moreover, the City and DOE Defendants have also long been aware that
challenged policies and practices have had a disparate impact on students of color and students
with disabilities such as R.C., in that such students have been victimized by the challenged polices
at a far higher rate than their respective representation in the overall student population.

125.   Although, as discussed below, the City and DOE Defendants have recently formed
a Working Group to examine and propose reforms to the challenged policies and practices, any
such reforms only serve to underscore that the challenged policies existed and needed to be
addressed, albeit too late to protect the rights of Plaintiff here.

### The Working Group

126.     The City and DOE have recently conceded the existence and need to make changes

to the challenged policies and practices through their announcements of "school climate and

discipline reforms," and the creation of a School Safety Working Group to study, recommend and

enact further reforms.

127.     Ironically, on February 13, 2015, the same day that Plaintiff's rights were being

violated at Curtis H.S., the DOE issued a press release "announc[ing] a series of school climate

and discipline reforms – developed in partnership with the NYPD and the Mayor's Office of

Criminal Justice – that will ensure the safety and dignity of New York City's students…"

128.     In November of 2015, this partnership, known as the "School Safety Working

Group," issued an "MOU OUTLINE" detailing recommended amendments to the existing MOU

between the DOE and NYPD, which include:

•        School Safety personnel should (only) be responsible for responding to serious
criminal law matters where there is a real and immediate threat of serious physical injury to a
member of the school community;

•        DOE personnel shall only request assistance from School Safety personnel when
(1) necessary to protect the physical safety of students or staff; (2) required by law; or (3)
appropriate to address criminal behavior of persons other than students;

•        School Safety personnel should not be requested to remove students from
classrooms for routine disciplinary matters unless there is a real and immediate threat of serious
physical injury to a member of the school community or in other situations that can be safely and
appropriately handled by the school's disciplinary procedures;

•        Wherever possible, School Safety personnel should attempt to verbally engage
the student to stop the behavior or employ age-appropriate conflict resolution techniques to de-
escalate the situation; and

•        All School Safety Agents be trained in child and adolescent development,
conflicts and de-escalation techniques, conflict resolution, children with disabilities, the effects
of trauma, implicit bias and cultural competence, the school discipline code, and best practices
for policing schools.

129.     The School Safety Working Group also issued a memo entitled "Student

Misbehavior" (the "Student Misbehavior Memo"), which recommends that that "[DOE]

personnel have primary responsibility for intervening in and addressing student misbehavior and for ensuring consistent application of school rules and policies as set forth in the Discipline Code."

130.    The Student Misbehavior Memo recommends that

Department of Education personnel shall not request the intervention of School Safety when responding to normative child and adolescent behaviors, absent real and immediate threat of serious physical injury to a member of school community, including, but not limited to, disorderly conduct (as defined by N.Y. Penal Law 240.20); behaving in a rude, insubordinate, or disruptive manner; defying school officials; making excessive noise; violating the dress code or uniform policy; failing or refusing to provide identification upon request; profane, obscene, vulgar, or lewd language, gestures or behavior; use of racial or other slurs; cutting class, tardiness and unexcused absences; leaving school without permission; entering or attempting to enter a school building before or after hours (not breaking and entering); bullying including cyberbullying, verbal abuse, and/or harassment; vandalism and/or graffiti in a school building; possession of a prohibited item under the Discipline Code that does not violate the Penal Law (e.g., cell phone) and is not a category I weapon as defined in the Discipline Code;  and other behaviors categorized as Levels 1, 2 and 3  in the Discipline Code.

131.    The Student Misbehavior Memo also recommends that "[t]he above student behaviors shall be addressed by school administrators pursuant to the Discipline Code. DOE staff, including school administrators, may not request that these policies be treated as violations of the criminal law to be referred to police or the court system."

132.    With respect to the arrest of students, the School Safety Working Group also issued a memo entitled "Arrest of Students" (the "Student Arrest Memo") which recommends that "[e]xcept in instances of immediate danger to students or others, in order to arrest a student, a member of the school safety division or a precinct officer must have: (1) probable cause to believe that the student has committed a misdemeanor or felony that is not conduct listed in the Student Misbehavior [Memo], and (2) the agreement of the principal or designee that a formal arrest is necessary to preserve student safety."

133.    The Student Arrest Memo also recommends that "[s]tudents shall not be subject to arrest or criminal prosecution for the crimes of obstructing governmental administration or

resisting arrest where the underlying infraction is a school discipline matter, including the conduct listed in the Student Misbehavior [Memo]."

134.    The Student Arrest Memo also recommends that "[u]nder no circumstances shall a summons be issued or an arrest made of a student on school grounds or at a school-sponsored event based solely on a non-criminal violation of the penal law."

135.    The Student Arrest Memo also recommends that "[s]tudents shall not be arrested in school for the following offenses:

- Disorderly Conduct (N.Y. Penal Law §240.20)

- Harassment (N.Y. Penal Law §240.26)

- Graffiti (N.Y. Penal Law §145.60)

- Criminal Mischief (N.Y. Penal Law §145.00)

- Obstructing Governmental Administration (N.Y. Penal Law §195.05) or Resisting Arrest (N.Y. Penal Law §205.30) when the underlying offense is listed above or in the Student Misbehavior section."

136.    Significantly, the establishment of the School Safety Working Group and its proposed revisions and changes to the policies and practices challenged here, while admirable, are in and of themselves concessions/admissions as to the existence and need to change the exact policies and procedures that were in place and that resulted in Defendants' unlawful treatment of R.C.

137.    Indeed, virtually every one of the School Safety Working Group's policy recommendations target precisely the wrongful conduct that R.C. was subjected to on February 13, 2015 – ironically the same day the proposed "school discipline reforms" and the formation of the School Safety Working Group were announced.

138.    That same day, after being sent to the Dean's office for allegedly "behaving in a rude, insubordinate, or disruptive manner," R.C. was physically arrested for allegedly "defying

school officials" by not entering the Dean's office before calling his mother first - because he was justifiably afraid of what an agitated group of School Safety Agents and A.P. of Security might do to him. Then, after School Safety Agents and A.P. Burbano used excessive force to wrongfully arrest, handcuff and wrongfully detain him, R.C. was falsely charged with criminal charges that had the current School Safety Working Group's recommendations been in place, would have specifically prohibited.

### Defendants' Escalated Response To Minor Misbehavior By A Disabled Student Was Intentional And/Or Recklessly Indifferent To His Diagnosed Disabilities

139.   R.C. is a student with disabilities who has had an individualized education plan ("IEP") since middle school.

140.   R.C.'s January 25, 2012 Psycho-Educational Report conducted for his middle school found that "[R.C.'s] behavior interferes with his learning," and that R.C's middle school teachers had implemented a behavior plan ("BIP") to address these behaviors, which included "following teacher directions, remaining in his seat, raising his hand, and refraining from insulting classmates and talking back to teachers."

141.   R.C.'s 2013 IEP for Curtis H.S. (the "2013 IEP") stated that R.C. "had a difficult time transitioning into the High School setting. [R.C.] does not attend all of his classes and he has a difficult time following school rules. [R.C.] does not respond well to authority figures in school building and has been verbally aggressive and disrespectful towards adults."

142.   R.C.'s 2014 IEP (the "2014 IEP") for Curtis H.S. stated that R.C. had previously been evaluated on 1/17/2012 for academic and behavioral difficulty.

143.   The 2014 IEP also stated that that R.C. had entered Curtis H.S. in September of 2012 and that he had been previously been placed in home instruction "which resulted after he was diagnosed with Anxiety Disorder."

144.    The 2014 IEP also stated that

R.C. appears to work well in a one-on-one setting, but has manifested a long-standing problem of dealing with obstacles when placed in a larger setting.  In the larger context, his school history attests to patterns of anxiety, inattention and disruptive behavior dating back several years.  He has demonstrated a pattern of reactivity to frustration in which he becomes: overwhelmed in the moment (he is unable to break down the whole situation, understand the details and create a solution), finds himself unable to put into words the frustration he experiences, at a loss to effectively withdraw from the perceived noxious event (tension continues to accelerate), leaving him with only one modality to defend his sense of being 'wronged' – some form of acting-out behavior (disruptive, inattention, verbal aggression, etc.).

145.    Despite the fact that (a) R.C. had a BIP in place as early as middle school, and (b) R.C.'s 2013 and 2014 IEPs clearly indicated that his behavior was interfering with his education, (c) R.C.'s alleged disciplinary record at Curtis H.S. showed a pattern of behavior issues, and (d) R.C was home-schooled for an extensive period of time due to treatment for an anxiety disorder, the need for an FBA or BIP or other proposed plan or service to address his disabilities was never recommended or discussed with R.C.'s parents.

146.    Moreover, R.C.'s 2014 IEP contradicted its own stated findings and inexplicably concluded that R.C.'s behavior did not impede his education or others, and that therefore he was not in need of a BIP.

147.    Thus, on April 30, 2015 an Impartial Hearing Officer correctly concluded that: (i) R.C.'s social and emotional disabilities that resulted in the conduct in question were connected to his learning disability; (ii) that that Defendant DOE was aware of that R.C. had emotional difficulties that led to the type of behavior at issue at least as far back as January of 2011; (iii) that Defendant DOE should have conducted a Functional Behavior Assessment ("FBA") to address R.C.'s social and emotional needs; and (iv) that Defendant DOE did not inform T.C. that an FBA and a BIP were needed or that recommendations should have been developed on R.C.'s IEP that could address his behaviors.

148.    The DOE Defendants were required to conduct an FBA and to implement a BIP to address R.C.'s social and emotional needs under the Individuals with Disabilities Education Act ("IDEA").

149.    DOE Defendants were required to inform T.C. of the need to conduct an FBA and to implement a BIP to address R.C.'s social and emotional needs under the IDEA.

150.    Indeed, had an FBA been conducted, a positive BIP could and should have been implemented that would have utilized positive behavioral interventions and supports, and other strategies to address the type of behavior which occurred on February 13, 2015 for which the DOE Defendants had notice as far back as January of 2011.

151.    Instead, despite due notice of R.C.'s social and emotional needs, DOE Defendants did nothing to address those needs, and instead of utilizing positive behavioral interventions and supports to address his behaviors, DOE Defendants responded in a way that escalated what was a "teachable moment" to a situation that ultimately resulted in the unconstitutional arrest and use of force against R.C., resulting in a concussion, neck contusion and continuing emotional distress, trauma and anxiety.

152.    Although an FBA and BIP were never implemented, it is clear that, at the very least, positive behavioral interventions aimed at de-escalation should have been used, instead of the unconstitutional violation of R.C.'s rights, involving an aggressive "show of force" by School Safety Agents against an emotionally disabled child known to have problems responding to authority.

153.    Moreover, Defendants Dean McGie and Principal Curtis, who had actual knowledge of R.C.'s disabilities and IEP and who witnessed and ratified the unconstitutional treatment of R.C. on February 13, 2015, knew or should have known that positive behavioral

interventions and strategies should have been used instead of force, and that the treatment he was being subjected to was unconstitutional.

154.    The February 13, 2015 incident was a tragedy waiting to happen and a foreseeable and direct consequence of DOE Defendants' conscious choice to ignore R.C.'s disabilities and to instead respond to R.C.'s behavioral and emotional difficulties in a punitive manner rather than developing and implementing the appropriate BIP as required by law under the IDEA.

155.    As discussed, hereunder, DOE Defendants' conscious choice to ignore R.C.'s disabilities and to instead respond to R.C.'s behavioral and emotional difficulties in a punitive manner is not isolated to R.C. but rather part of policy and practice of unlawfully seizing and arresting and using excess force and using inappropriate disciplinary actions, including suspensions, against disabled students for minor school misbehavior that does not amount to probable cause of criminal activity instead of responding to such those behavioral and emotional difficulties as manifestations of those students disabilities and conducting an FBA and implementing the appropriate BIP as required by law under the IDEA.

156.     In addition to their obligations under the IDEA, Defendants also had obligations to develop a plan and to provide services calculated to accommodate R.C.'s disabilities Section 504 of the Rehabilitation Act of 1973 ("Section 504") and also to provide R.C. with reasonable accommodations for his disabilities under the Americans with Disabilities Act of 1990 (the "ADA"), which they were recklessly indifferent to.

157.    Instead, Defendants consciously ignored R.C.'s needs and violated his rights under 42 U.S.C. §1983 by and through their violations of the IDEA and, as further alleged below, through their violation of Section 504 of the Rehabilitation Act ("Section 504") and the Americans with Disabilities Act (the "ADA").

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**: UNLAWFUL SEIZURES AND ARRESTS
IN VIOLATION OF THE FEDERAL CONSTITUTION

158.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

159.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable pursuant to 42 U.S.C. §1983 for the unlawful seizure and arrests of R.C. in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

**SECOND CAUSE OF ACTION**: EXCESSIVE USE OF FORCE
IN VIOLATION OF THE FEDERAL CONSTITUTION

157.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

158.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable pursuant to 42 U.S.C. §1983 for the use of excessive force against of R.C. in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

**THIRD CAUSE OF ACTION**: SUBSTANTIVE DUE PROCESS

159.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

160.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable pursuant to 42 U.S.C. §1983 for abuses of the United States Constitution that shock the conscience in violation of the Fourteenth Amendment of the United States Constitution.

**FOURTH CAUSE OF ACTION**: VIOLATION OF RIGHTS UNDER 42 U.S.C.
§1983 FOR VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES
EDUCATION ACT

161.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

162.    The DOE Defendants were required to conduct a Functional Behavior Assessment ("FBA") and to develop a Behavioral Implementation Plan ("BIP") to address R.C.'s disabilities under the IDEA and its implementing regulations.

163.    The DOE Defendants violated their obligations to R.C. under the IDEA through their intentional and/or reckless indifference to R.C.'s disabilities and their intentional and/or reckless failure to conduct an FBA and develop a BIP hat would have utilized positive behavioral interventions and supports, and other strategies to address R.C.'s behavior, which was a manifestation of his learning disability and anxiety disorder.

164.    The DOE Defendants violated their obligations to R.C. under the IDEA through their intentional and/or reckless indifference to his disabilities and their intentional and/or reckless failure to conduct an FBA and BIP calculated to utilize positive behavioral interventions and supports, and other strategies to address R.C.'s behavior as a manifestation of his disabilities.

165.    Instead, the DOE Defendants, in concert with other Defendants, responded to the behavioral manifestations of R.C.'s disability in an illegal and unconstitutional manner that also discriminated against him for the very disabilities that the DOE Defendants were under a duty to develop a plan and provide services for under the IDEA.

166.    As a result of the DOE Defendants intentional and/or reckless indifference of R.C.'s disabilities and Defendants' intentional and/or reckless violation of their IDEA obligations to him, R.C. has suffered continuing physical, mental and emotional damages, and has also been deprived of a free and appropriate public education (FAPE).

167.    The DOE Defendants are thus liable pursuant to 42 U.S.C. §1983 for compensatory and punitive damages as a result of their intentional and/or recklessly indifferent violations of their obligations to R.C. under the IDEA.

**FIFTH  CAUSE OF ACTION:** VIOLATION OF RIGHTS

**UNDER THE SECTION 504 OF THE REHABILITATION ACT**

168.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

169.    R.C. is a person with a physical and mental impairment that substantially limits one or more major life activities as defined under Section 504 of the Rehabilitation Act of 1973 ("Section 504").

170.    The DOE Defendants conduct programs and activities that receive federal financial assistance under Section 504.

171.    Under Section 504, the DOE Defendants were required to provide R.C. with an appropriate public education comparable to students without disabilities through the development of a plan and to provide services calculated to accommodate his disabilities.

172.    The DOE Defendants violated their obligations to R.C. under Section 504 through their intentional and/or reckless indifference to his disabilities and their intentional and/or reckless failure to develop a plan and to provide services calculated to accommodate his disabilities which manifested themselves as behavioral problems.

173.    Instead, the DOE Defendants, in concert with the other Defendants, responded to the behavioral manifestations of R.C.'s disability in an illegal and unconstitutional manner that also discriminated against R.C. for the very disabilities that the DOE Defendants were under a duty to develop a plan and provide services under Section 504.

174.    As a result of Defendants' intentional and/or reckless indifference of R.C.'s disabilities and Defendants' intentional and/or reckless violation of their Section 504 obligations to him, R.C. has suffered continuing physical, mental and emotional damages and has also been deprived of an appropriate public education.

175.    The DOE Defendants are thus liable for compensatory and punitive damages as a result of their intentional and/or recklessly indifferent violations of their obligations to R.C. under Section 504.

### SIXTH  CAUSE OF ACTION: VIOLATION OF RIGHTS UNDER THE AMERICANS WITH DISABILITIES ACT

176.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

177.    R.C. is a qualified individual with a disability as defined under the Americans with Disabilities Act of 1990 ("ADA").

178.    The DOE Defendants provide public services and accommodations as defined under the ADA.

179.    Under the ADA, the DOE Defendants were required to provide R.C. with reasonable accommodations for his disabilities.

180.    The DOE Defendants violated their obligations to R.C. under the ADA through their intentional and/or reckless indifference to his disabilities, and their intentional and/or reckless failure to accommodate his disabilities, which manifested themselves as behavioral problems.

181.    Instead, the DOE Defendants and the other Defendants responded to the behavioral manifestations of R.C.'s disabilities in an illegal and unconstitutional manner that discriminated against R.C. for the very disabilities that Defendants were under a duty to accommodate under the ADA.

182.    As a result of the DOE Defendants' intentional and/or reckless indifference to R.C.'s disabilities and Defendants' intentional and/or reckless violation of their ADA

obligations to him, R.C. has suffered physical, mental and emotional damages, and has also been deprived of an appropriate public education.

**SEVENTH CAUSE OF ACTION: UNLAWFUL SEIZURE AND ARREST**
**IN VIOLATION OF THE NEW YORK STATE CONSTITUTION**

183.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

184.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable pursuant to Article 1 §12 of the New York Constitution for the unlawful seizure and arrest of R.C.

**EIGHTH CAUSE OF ACTION: FALSE ARREST**
**IN VIOLATION OF NEW YORK LAW**

185.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

186.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable for the false arrest of R.C. in violation of New York law.

**NINTH CAUSE OF ACTION: ASSAULTS**
**IN VIOLATION OF NEW YORK LAW**

187.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

188.    City Defendants, Defendant DOE, Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable for the assaults of R.C. in violation of New York law.

**TENTH CAUSE OF ACTION: BATTERIES**
**IN VIOLATION OF NEW YORK LAW**

189.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

190.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable for the batteries of R.C. in violation of New York law.

**ELEVENTH CAUSE OF ACTION: NEGLIGENCE**
**IN VIOLATION OF NEW YORK LAW**

191.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

192.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis were under a duty to use due care to protect R.C. and to refrain from conduct that would cause physical and emotional harm to him.

193.    Through the aforementioned conduct, City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis breached their duty towards R.C. by failing to use reasonable care to protect him and to refrain from conduct that would cause physical and emotional harm to him, which did in fact cause R.C. to suffer severe physical and emotional harm, which was a reasonably foreseeable consequence of such wrongful conduct.

194.    In addition to being unreasonable, the conduct of City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis was also reckless and indifferent to their duty to protect R.C. and refrain from the conduct that caused severe physical and emotional harm to him.

195.    City Defendants, Defendant DOE, Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable to R.C. for the severe and continuing physical and emotional damages they caused and inflicted upon him.

196.    In addition, because T.C. was within the zone of danger that brought about the severe physical and emotional damages to her son, R.C., T.C. also suffered severe emotional distress and damages for which City Defendants, Defendant DOE and Defendants A.P.

Burbano, Dean McGie and Principal Curtis are also liable to T.C., in her individual capacity, for their negligent infliction thereof.

**TWELFTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN VIOLATION OF NEW YORK LAW**

197.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

198.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis conduct was extreme and outrageous; was intended to cause or substantially disregarded the substantial probability of causing conduct severe emotional distress to T.C. and R.C., and did in fact cause T.C. and R.C. to suffer severe emotional distress.

199.    City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable to both T.C on behalf of R.C. and to T.C. individually for their intentional infliction of emotional distress on both T.C. and R.C.

**THIRTEENTH CAUSE OF ACTION: LOSS OF CONSORTIUM**

200.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

201.    T.C. is the parent and natural guardian of T.C.

202.    Solely by reasons of the conduct of City Defendants, Defendant DOE and Defendants A.P. Burbano, Dean McGie and Principal Curtis conduct alleged hereunder, T.C. has been and continues to be deprived of the love, comfort, companionship and affection of her son R.C. and has been required to expend monies and incur costs for the care, cure and treatment of the injuries sustained by her son, R.C. for which City Defendants, Defendant DOE, and Defendants A.P. Burbano, Dean McGie and Principal Curtis are liable to T.C. individually.

**JURY TRIAL DEMAND**

203.     Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that the Court:

1.     Assume jurisdiction over this matter;

2.     Declare that the policy and practice of the City and DOE Defendants of seizing and arresting school children in New York City public schools absent probable cause of criminal activities exists and violates these students' federal and state rights;

3.     Declare that the policy and practice of the City and DOE Defendants of using excessive force against school children in New York City public schools exists and violates these students' federal and state rights;

4.     Declare that the policy and practice of the City and DOE Defendants of suspending, seizing and arresting and using excessive force against disabled school children absent probable cause of criminal activities in New York City public schools violates these students federal and state rights;

5.     Award compensatory and punitive damages for injuries sustained by Plaintiff;

6.     Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. §1988; and

7.     Grant any other relief the Court deems necessary and proper.

Dated:  May 27, 2016

> Respectfully submitted,
>
> McCALLION & ASSOCIATES LLP
>
> /s/Kenneth F. McCallion_____
> Kenneth F. McCallion (KM 1591)
> Kristian K. Larsen
> 100 Park Avenue – 16th floor
> New York, New York 10017
> Tel: (646) 366-0884
> Fax: (646) 366-1384

Attorneys for Plaintiff
KFM@McCallionlaw.com